738 S.E.2d 835

Michael D. CRISP, Jr., Employee, Petitioner,

v.

SOUTHCO., INC., Employer, and Pennsylvania National Mutual Casualty Insurance Co., Carrier, Respondents.

Appellate Case No. 2010–180906.

No. 27230.

Supreme Court of South Carolina.

Heard Oct. 2, 2012.

Decided March 6, 2013.

Rehearing Denied May 22, 2013.

630

Kathryn Williams, of Greenville, for Petitioner.

Vernon F. Dunbar, of Turner Padget Graham & Laney, P.A., of Greenville, and Carmelo Barone Sammataro, of Turner Padget Graham and Laney, P.A., of Columbia, for Respondents.

Chief Justice TOAL.

Michael D. Crisp (Petitioner) petitioned this Court for a writ of certiorari to review the court of appeals' decision reversing the circuit court's finding that the Appellate Panel of the Workers' Compensation Commission (the Commission)

erroneously determined that Petitioner suffered a compensable brain injury and physical brain damage as a result of an injury by accident while working for Respondent SouthCo., Incorporated (Employer). We reverse the decision of the court of appeals, and remand this action to the Commission for further consideration of whether Petitioner sustained physical brain damage, as contemplated under section 42–9–10(c) of the Workers' Compensation Act (the Act), which would entitle him to benefits for life.

## FACTS/PROCEDURAL BACKGROUND

Petitioner [1] worked for Employer hydra-seeding grass and performing odd construction jobs. On March 10, 2004, Petitioner and other workers were installing silt fencing to combat ground erosion. This task involved installing fence poles into the ground using the bucket of a Bobcat earthmover. On this particular day, Petitioner was holding a pole while another worker operated the Bobcat. As Petitioner bent down to reach for a pole, the bucket of the Bobcat fell on Petitioner, covering him.[2] Petitioner stated he remembered running towards a truck at the jobsite, noticing that his right hand was broken and bleeding. Petitioner's co-workers also alerted him to a gash on the back of his head that was also bleeding. Petitioner was taken to the emergency room.

At the emergency room, Petitioner was treated for abrasions and bruises to the back of the head and neck and a complex fracture in his right hand. There is no mention of a brain injury in Petitioner's hospital records.

Petitioner required surgery to his right hand. Orthopedist James Essman performed the surgery and continued to treat Petitioner's hand injury. Dr. Essman's notes do not reflect any post-operative complaints regarding any brain injury or symptoms.[3]

---

1. Petitioner formally completed seventh grade and received his G.E.D. Since completing his schooling, Petitioner has performed general labor jobs.

2. The bucket of the Bobcat was fabricated out of solid steel and weighed approximately 600 pounds.

3. Dr. Essman ultimately declared that Petitioner reached Maximum Medical Improvement (MMI) with respect to his hand on September

On March 23, 2004, Petitioner was treated for back pain, neck pain, and nausea by his family doctor, Dr. Hunter Leigh. Dr. Leigh noted that Petitioner complained of "headaches." On April 16, 2004, Dr. John Klekamp, an orthopedic surgeon, also evaluated Petitioner and diagnosed him with cervical strain, lumbar strain, and a fracture of the right hand. At his appointment on June 6, 2004, Dr. Klekamp noted that Petitioner was "neurologically intact," but, in his notes following a July 7, 2004, appointment, stated Petitioner still suffered from "intermittent headaches."

On August 12, September 2, and September 23, 2004, Dr. Kevin Kopera, a physician with the Center for Health and Occupational Evaluation, evaluated Petitioner and diagnosed him with chronic cervical strain, chronic lumbar strain, and a broken right hand. During the course of his evaluation, Dr. Kopera noted that Petitioner had "no cognitive deficits." However, after treating him on September 23, 2004, Dr. Kopera noted,

> One issue raised was [Petitioner] continues to have headaches.... [Petitioner's] wife questioned why he has not undergone MRI imaging of his head due to his persistent headaches. He did sustain a blow to the head in terms of his work injury and I guess this was not considered by prior evaluating physicians and we discussed this at some length today.

Therefore, Dr. Kopera diagnosed Petitioner with chronic cervical strain, chronic lumbar strain, and chronic headaches. In addition, Dr. Kopera stated "[Petitioner] appears neurologically intact but due to his persistent headaches it may be prudent to obtain an MRI scan of the brain to complete a thorough evaluation." The MRI scan of Petitioner's brain showed no abnormalities. After completing a Functional Capacity Evaluation, Dr. Kopera released Petitioner to return to work with restrictions, and noted Petitioner "report[ed] feeling de-

16, 2004. *See O'Banner v. Westinghouse Elec. Corp.*, 319 S.C. 24, 28, 459 S.E.2d 324, 327 (Ct.App.1995) ("[MMI] is a term used to indicate that a person has reached such a plateau that in the physician's opinion there is no further medical care or treatment that will lessen the impairment.").

pressed related to his current condition and this will take some adjustment." [4]

On April 12–13, 2005, Dr. Moss, a clinical psychologist, performed a neuropsychological evaluation on Petitioner at the request of Petitioner's attorney. Dr. Moss noted:

On the basis of the current examination, there are clear indications of deficits in verbal memory, attention, problem solving, and inhibition tied to his work injury. There are indications that he has likely experienced personality changes as a result of his injury ... [Petitioner] is experiencing psychological distress from his injuries as well. The exacerbation of obsessive-compulsive tendencies can also be associated with brain injuries involving the orbito-frontal area. This is often affected in head injury cases due to the irregular shape of the skull and olfaction is often affected since the olfactory bulbs are there. The current findings would be consistent with a frontal lobe injury.

Based on his examination, Dr. Moss diagnosed Petitioner with Cognitive Disorder [not otherwise specified], probable personality change due to head injury, obsessive compulsive disorder, traumatic brain injury, and poly-substance abuse [5] in full sustained remission. Dr. Moss further opined that Petitioner could benefit from a brain injury program.

On May 24, 2006, Dr. Thomas Collings, a neurologist, conducted an independent medical evaluation on Petitioner. Dr. Collings diagnosed Petitioner with a traumatic brain injury/closed head injury, defining a closed head injury as "trauma to the brain in a global way as opposed to ... a focal area of the brain ... caus[ing] symptoms in ... higher competent motions." Based on his in-office examination of Petitioner, Dr. Collings expressed some reservation with regard to his

---

4. During this time period, Petitioner also attended regular physical therapy sessions to rehabilitate his injuries. On August 24, 2004, Petitioner's physical therapy intake sheet notes "severe headaches." On September 22, 2004, Petitioner's physical therapist noted that Petitioner reported headaches three times per week. On October 4, 2004, the physical therapist's notes indicate that Petitioner's headaches were "still bad."

5. Petitioner has an extensive history of narcotic drug and alcohol abuse and was addicted to marijuana, cocaine, crystal meth, heroine, and LSD before achieving sobriety in 2003.

diagnosis, but he stated that the neuropsychological examination was the "best information to support that there's ... significant change between this pre-and-post condition," as it was a better indicator of brain injury than his office examination. Dr. Collings also expressed some hesitation in his diagnosis with respect to Petitioner's headaches, testifying that he would have difficulty finding any evidence to support a finding of physical brain injury had he not relied on Dr. Moss's findings. However, Dr. Collings ultimately concluded that Petitioner sustained a brain injury.

On November 15 and 28, 2005, Dr. David Price, a clinical psychologist, conducted a neuropsychological evaluation on Petitioner at the request of defense counsel. Dr. Price opined that Petitioner did not sustain a traumatic brain injury nor was there any objective medical evidence of a brain abnormality, such as an abnormal CT scan, MRI, or EEG. Dr. Price diagnosed Petitioner with pain disorder associated with psychological factors and a general medical condition, adjustment disorder with depressed mood, obsessive compulsive disorder, antisocial personality disorder, partner relational problem, and phase of life problem.

On March 6, 2006, nearly two years after his injury, Dr. Moss opined that Petitioner "sustained physical brain damage as a result of his work injury of [sic] March 10, 2004."

At his deposition, Petitioner testified he began experiencing problems with his memory and difficulties mentally processing information, concentrating on more than one task, and keeping up with daily tasks in January 2005.[6] Petitioner testified he desired to receive further treatment to "learn to cope with the ability to multitask and to remember things and stay focused." Furthermore, Petitioner testified he suffered from depression since the accident, and he desired to receive treatment for this condition, as well. Petitioner testified he had not been able to obtain employment since the accident.

A hearing was convened before the Workers' Compensation Hearing Commissioner (the Single Commissioner) on March 22, 2006. At the hearing, Petitioner claimed he sustained

---

6. Up until this time, Petitioner testified his wife "had ... been doing everything for [him]," so he did not notice these symptoms prior to January 2005 around the time they separated.

injuries to his head, brain, neck, back, right upper extremity, and psyche as a result of the accident and sought continued temporary compensation benefits and continued medical treatment, including treatment in a traumatic brain injury program, and in the alternative, sought a finding that he was permanently and totally disabled and entitled to lifetime compensation benefits due to "physical brain damage." Respondents conceded Petitioner sustained compensable injuries to his neck, back, and right upper extremity, but denied he sustained a brain injury and physical brain damage as a consequence of the work-related incident. Respondents further argued that Petitioner reached MMI on November 1, 2004, and sought a determination of permanent disability and credit for alleged overpayment of temporary disability compensation benefits.

By order dated August 1, 2006, the Single Commissioner found as fact, *inter alia:* (1) that approximately one year after the incident, Dr. Moss evaluated Petitioner and, using objective neuropsychological testing revealing cognitive deficits, diagnosed Petitioner with Cognitive Disorder [not otherwise specified], polysubstance abuse in full sustained remission, probable personality change due to head injury, exacerbated obsessive-compulsive disorder, traumatic brain injury, and *"physical brain damage"*; (2) that Dr. Collings's expert opinion was credible, including his testimony that he never saw an MRI or CT scan of Petitioner's brain, that cognitive problems usually start immediately after the injury, that the fact that Petitioner did not lose consciousness signified that his head trauma was likely less serious, that he would expect Petitioner to complain of headaches and seek medical intervention for those headaches soon after the accident if they had been severe, that no objective tests suggested Petitioner had a *"physical brain injury,"* and that none of the attending physicians mentioned any brain injury symptoms, nor referred Petitioner for further testing; (3) that, based on the opinions of Dr. Moss and Dr. Collings, Petitioner sustained a head injury resulting in cognitive disorders to his brain, but did not sustain a *"physical brain injury"*; (4) that Petitioner sustained compensable head, psychological, and neuropsychological injuries; (5) that Dr. Collings and Dr. Moss opined that Petitioner needed additional psychological and neuropsycho-

logical evaluation and treatment, including, but not limited to, evaluation and treatment in a brain injury center; (6) that Petitioner was unable to work and temporarily totally disabled because of his injuries, including his psychological and head injuries, and remained unable to work and temporarily totally disabled because of his psychological and head injuries; (7) that, based on the opinions of Dr. Moss and Dr. Collings, Petitioner had not reached MMI for his head and psychological injuries; and (8) that the determination of Petitioner's permanent disability because of his injury by accident was premature. (emphasis added).

Consequently, the Single Commissioner determined, as a matter of law, that Petitioner sustained an injury by accident causing compensable injuries to his neck, back, right upper extremity, and head, causing compensable psychological and neuropsychological injuries, and causing compensable cognitive disorders, and Petitioner reached MMI from his right upper extremity, neck, and back injuries, but not from his head and psychological injuries. Thus, the Single Commissioner found Respondents were responsible

> for all causally related medical treatment and expenses from March 10, 2004 to the present and continuing, including but not limited to causally related medical, psychological, and neuropsychological evaluation and treatment for [Petitioner's] physical, psychological, and neuropsychological injuries, evaluation and treatment for claimant's physical, psychological, and neuropsychological injuries, evaluation and treatment in a brain injury center, and necessary medications[,]

and ordered Respondents to pay Petitioner "temporary total disability compensation benefits from March 10, 2004 and continuing until further Order of the Commission or agreement of the parties."

Pursuant to its statutory authority, the Commission reviewed the Single Commissioner's order. *See* S.C.Code Ann. § 42–17–50 (Supp.2011) (providing that "the Commission shall review the award and, if good grounds be shown therefor, reconsider the evidence, receive further evidence, rehear the parties or their representatives, and, if proper, amend the award[ ]"). The Commission unanimously affirmed the Single

Commissioner's order with respect to all of the findings of fact and conclusions of law contained therein and incorporated the Single Commissioner's entire order by reference.

On appeal, the circuit court[7] reversed the Commission, finding that the Commission's order was "internally inconsistent" and "the only conclusion that can be reached on this record is that [Petitioner] has sustained *physical brain damage* as a result of his injury by accident." (emphasis added). More specifically, the circuit court stated:

> Despite finding Dr. Moss credible, adopting the findings of brain injury related symptoms and conditions that he used to diagnose frontal lobe brain injury and physical brain damage, and awarding treatment in a "brain injury program" he recommended[,] the Commission determined that [Petitioner] had not sustained physical brain injury. That conclusion contradicts the Commission's findings of brain injury related conditions, such as Cognitive Disorder [not otherwise specified], and is clearly erroneous. The Commission rejected the other expert's report, so there is no other credible evidence in the record on which the Commission can base its findings that claimant did not sustain *physical brain damage*.

(emphasis added). Based on the foregoing, the circuit court concluded that the Commission's finding in contravention of these facts was "erroneous" and was "not supported by the evidence" and found, as a matter of law, that Petitioner "sustained *physical brain damage* within in the meaning of the Act." (emphasis added).

Respondents appealed. *See Crisp v. SouthCo., Inc.,* 390 S.C. 340, 701 S.E.2d 762 (Ct.App.2010). In contrast to the circuit court, the court of appeals found that the Record was "replete with substantial evidence to support the Commission's finding that [Petitioner] did not sustain a *physical brain injury* based on Dr. Collings' testimony and the medical records of Crisp's physicians." *Id.* at 344–45, 701 S.E.2d at 765 (emphasis added). The court of appeals pointed to the following evidence in the Record to justify upholding the

---

7. Because Petitioner's injuries occurred prior to July 1, 2007, the Commission's decision was subject to review by the circuit court sitting in its appellate capacity.

Commission's decision on substantial evidence grounds: (1) the medical records of the physicians who treated Petitioner in the hospital immediately following the accident did not mention any symptoms normally associated with a *"physical brain injury"*; (2) the physicians attending Petitioner following the surgery on his hand did not diagnose a *"physical brain injury"*; (3) the MRI scan conducted by Dr. Kopera did not identify any brain abnormalities indicative of a *"physical brain injury,"* instead suggesting Petitioner's brain was neurologically intact; (4) and Dr. Collings's testimony at the hearing before the Single Commissioner that Petitioner's injury was not typical of a brain injury,[8] that Petitioner's headaches were not typical in character and severity to those suffered when a significant brain injury occurs and his conclusion that he would have "great difficulty" in diagnosing Petitioner with a *"physical brain injury"* entitling Petitioner to a lifetime of benefits absent Dr. Moss's report and a vocational evaluation stating Petitioner was not employable. *Id.* at 345–46, 701 S.E.2d at 765–66.

On appeal to this Court, Petitioner contends the court of appeals erred in finding the Commission's decision that Petitioner "has not sustained *physical brain damage*" was supported by substantial evidence in the Record, erred in finding that substantial evidence supported the Commission's findings where the findings were contradictory, and erred in upholding the Commission's decision because the only conclusion that could be reached on the evidence was that Petitioner sustained

---

8. More specifically, the court of appeals relied on the following testimony from Dr. Collings concerning Petitioner's diagnosis:

What's missing to me and what was missing when I examined him myself and tried to elicit this history is he doesn't seem to recall being hit in the head. He wasn't complaining of head trauma or pain at the time. He was not aware that he had a cut on the head. It was only when someone else was pointing out to him and he was not immediately but very briefly able to get up and run after the accident and was concerned about his hands. All of those things stand in contrast to someone who should've had a significant head injury, closed head injury, they're knocked out. They're unconscious for a period of time and then they're confused when they wake up from that and they're often unable to get up and would be ataxic or have [no] control of their balance and so forth. All of these things are lacking in that report. Did he have a head injury? Yes, he had some type of head injury but it appears from the records to be very minor.
*Crisp,* 390 S.C. at 345–46, 701 S.E.2d at 765.

*"physical brain damage"* within the meaning of the Act. (emphasis added).

We granted certiorari to review the court of appeals' decision pursuant to Rule 242, SCACR.

## STANDARD OF REVIEW

The Administrative Procedures Act (the APA) "governs appellate review of a final decision from an administrative agency." *Hill v. Eagle Motor Lines,* 373 S.C. 422, 427, 645 S.E.2d 424, 428 (2007) (citation omitted); *see* S.C.Code Ann. § 1–23–310 et seq. (Supp.2011). Under the APA, this Court "may not substitute its judgment for the judgment of the agency as to the weight of the evidence on questions of fact." S.C.Code Ann. § 1–23–380(A)(5); *Shealy v. Aiken Cnty.,* 341 S.C. 448, 455, 535 S.E.2d 438, 442 (2000) (the Commission is tasked with finding facts, evaluating the credibility of the witnesses, and assigning weight to the evidence). However,

[t]he court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1–23–380(A)(5)(a)–(f).

## ANALYSIS

We agree with Petitioner that the court of appeals erred in upholding the Commission's decision, albeit not for any of the reasons propounded by Petitioner.

Notably, the Commission did not resolve the permanent status of Petitioner's brain injuries. Rather, the Commission's order manifests a clear intention to delay a perma-

nency finding with respect to Petitioner's brain injury because Petitioner had not yet reached MMI, and therefore, the Commission ordered further testing and treatment to be paid for by Respondents, including but not limited to treatment in a brain injury trauma center, and directed Respondents to continue to pay temporary total disability compensation "until further [o]rder of the Commission or agreement of the parties." In the substance of the order, however, the Commission found that Petitioner sustained a traumatic closed head injury as a result of an injury by accident and that the head injury caused compensable neuropsychological injuries and cognitive disorders, yet the Commission further found that Petitioner did not sustain a "physical brain injury."

From this inartful phrasing onward, the circuit court, the court of appeals, and the parties in their arguments to the various tribunals and in their briefs have alternatively referred to Petitioner's brain injuries in terms of "physical brain injury" and "physical brain damage," despite the marked difference in the length of time compensation may be awarded when the injury is "physical brain damage" contemplated under section 42–9–10(C) of the South Carolina Code.

Petitioner now contends that, because all of the probative expert evidence contained in the Record proves Petitioner sustained a brain injury and physical brain damage within the meaning of the Act, and the Commission made a direct finding on that point, the only conclusion this Court may reach on this Record is that Petitioner suffered "physical brain damage." Thus, Respondents argue "[t]he critical issue in this case is whether the Commission correctly concluded that [Petitioner] is not entitled to lifetime benefits for a physical brain injury that no objective medical evidence supports," and the court of appeals did not err in reversing the circuit court because the Record is replete with evidence supporting the Commission's finding that Petitioner did not sustain "physical brain damage" as contemplated by section 42–9–10(C).

These arguments were prematurely before the circuit court, court of appeals, and now this Court, as the Commission explicitly left the determination of permanency to a later date. However, we clarify, *infra*, what is meant by "physical brain damage" under section 42–9–10(C) for guidance on remand.

 Pursuant to section 42–1–160(A) of the South Carolina Code, for an injury to be compensable under the Act, it must be "an injury by accident" and "aris[e] out of and in the course of employment." *See* S.C.Code Ann. § 42–1–160(A) (Supp.2011). To this end, "[a]n injury arises out of employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal relationship between the conditions under which the work is to be performed and the resulting injury." *Rodney v. Michelin Tire Corp.*, 320 S.C. 515, 518, 466 S.E.2d 357, 358 (1996) (citation omitted). "Whether there is any causal connection between employment and an injury is a question of fact for the Commission." *Hill*, 373 S.C. at 436, 645 S.E.2d at 431 (citation omitted). "The claimant has the burden of proving facts that will bring the injury within the workers' compensation law, and such award must not be based on surmise, conjecture or speculation." *Clade v. Champion Labs.*, 330 S.C. 8, 11, 496 S.E.2d 856, 857 (1998) (citation omitted).

 In general, a person injured within the Act may not receive compensation for a period exceeding five hundred weeks. *See* S.C.Code Ann. § 42–9–10(A) (Supp.2011); S.C.Code Ann. Reg. § 67–1101 (Supp.2011). However,

> Notwithstanding the five-hundred-week limitation prescribed in this section or elsewhere in this title, any person determined to be totally and permanently disabled who as a result of a compensable injury is a paraplegic, a quadriplegic, *or who has suffered physical brain damage* is not subject to the five-hundred-week limitation and shall receive the benefits for life.

*Id.* § 42–9–10(C) (Supp.2011) (emphasis added).

Petitioner argues that the mere presence of any physical brain injury or damage, regardless of degree, triggers the operation of section 42–9–10(C). This argument is not persuasive, as it is contrary to legislative intent and to the manner in which our courts have awarded compensation for injuries to the brain.

As we found in *Sparks v. Palmetto Hardwood, Incorporated*, 401 S.C. 619, 738 S.E.2d 831 (2013) (Shearouse Adv. Sh. No. 11 at 14), we view the inclusion of "physical brain damage," along with quadriplegia and paraplegia, in section 42–9–

10(C) as indicative of the General Assembly's intent to compensate an employee-claimant for life only in the most serious cases of injury to the brain, separate and apart from other scheduled injuries, resulting in permanent physical brain damage.

■ As noted in *Sparks,* permanency and physicality are requirements. However, the severity of the injury is the lynchpin of the analysis. *Cf. James v. Anne's Inc.,* 390 S.C. 188, 199, 701 S.E.2d 730, 736 (2010) ("The 500 weeks limitation, however, represents the limit of the *monetary* amount of compensation that may be recovered. It has no relation to the duration or the extent of the injury. A permanent impairment, by definition, lasts for a lifetime." (emphasis in original)).

■ Inherent in the requirement that the injury to the brain be severe is the requirement that the worker is unable to return to suitable gainful employment. *See Floyd v. C.B. Askins & Co.,* 382 S.C. 84, 90, 675 S.E.2d 450, 453 (Ct.App. 2009) (addressing whether an award made pursuant to § 42–9–10(C) survives death from an unrelated cause and noting that "[c]laimants suffering catastrophic injuries like Claimant's may require specialized healthcare without the means to earn a wage ... [, and] [t]he award of compensation for a claimant's life expectancy seems to recognize this reality."); *cf.* S.C.Code Ann. § 42–9–400(d) (Supp.2011) ("As used in this section, 'permanent physical impairment' means any permanent condition, whether congenital or due to injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining reemployment if the employee should become unemployed.").

While other states have also adopted by legislative enactment an exception to the general compensation rule for permanent total disability, none of these states appear to utilize the "physical brain damage" terminology. Importantly, these exceptions to the general compensation rule hinge on the employee-claimant's ability to return to work. For example, the Virginia statute, permits lifetime benefits for "injury to the brain which is so severe as to render the employee-claimant permanently unemployable in gainful employment." Va.Code Ann. § 65.2–503(C). Likewise, the North Carolina

statute on permanent total disability allows an employee-claimant to receive extended benefits over the 500–week limit if he or she sustains a "[s]evere brain or closed head injury as evidenced by severe and permanent: [s]ensory or motor disturbances; [c]ommunication disturbances; [c]omplex integrated disturbances of cerebral function; or [n]eurological disorders" unless "the employer shows by a preponderance of the evidence *that the employee is capable of returning to suitable employment.*" N.C. Gen.Stat. Ann. § 97–29(d)(3)(a.)–(d.) (emphasis added); *see also Dishmond v. Int'l Paper Co.*, 132 N.C.App. 576, 512 S.E.2d 771, 774 (1999) (affirming the Commission's award of total permanent disability where there was competent evidence in the record that total disability was the consequence of the employee-claimant's brain injury and where the evidence indicated the employee-claimant "could no longer function in a work environment"); *Slizewski v. Int'l Seafood, Inc.*, 46 N.C.App. 228, 264 S.E.2d 810 (1980) (finding the evidence supported a finding that claimant suffered permanent brain injury and was permanently unable to function in a work-related capacity).[9]

 Bearing these states' treatment in mind, we interpret the inclusion of "physical brain damage" among the most serious injuries within the statutory exception to the 500 week cap on benefits as an indication that the legislature was contemplating a brain injury so severe that the person could not subsequently return to suitable gainful employment. *See Adams v. Texfi Indus.*, 320 S.C. 213, 217, 464 S.E.2d 109, 112 (1995) ("In construing a statute, the Court looks to its language as a whole in light of its manifest purpose." (citing *Simmons v. City of Columbia*, 280 S.C. 163, 311 S.E.2d 732 (1984))); *Cokeley v. Robert Lee, Inc.*, 197 S.C. 157, 169, 14 S.E.2d 889, 894 (1941) ("While it is an elementary rule of construction that words used in a statute should be given their plain and ordinary meaning this, as all other rules, is subject to the prime object of ascertaining and giving effect to the legislative intention. In doing this, we are not to be governed

9. *See Adams v. Texfi Indus.*, 320 S.C. 213, 217, 464 S.E.2d 109, 112 (1995) ("The decisions of North Carolina courts interpreting that state's workers' compensation statute are entitled to weight because the South Carolina statute was fashioned after North Carolina's." (citation omitted)).

by the apparent meaning of words found in one clause, sentence, or part of the act, but by a consideration of the whole act, read in the light of the conditions and circumstances as we may judicially know they appeared to the Legislature, and the purpose sought to be accomplished." (quoting *State ex rel. Walker v. Sawyer*, 104 S.C. 342, 346, 88 S.E. 894, 895 (1916))). This interpretation is in harmony with the entire purpose of our workers' compensation regime and recognizes the other avenues of compensation available under the scheme for brain injuries that do not render the worker unemployable. *See Shealy v. Algernon Blair, Inc.*, 250 S.C. 106, 112, 156 S.E.2d 646, 649 (1967) ("The object of the act is to relieve an injured workman from the loss or impairment of his Capacity to earn wages."). Thus, only in cases of physical brain damage that are both permanent and severe would an employee-claimant be entitled to benefits for life.

The resolution of the question of whether an employee has sustained either a physical injury to the brain or physical brain damage gives rise to the coextensive question of what proof is required in these cases.[10] Respondents contend that the determination of whether Petitioner sustained "physical brain damage" in the instant case hinges on the fact that no objective measure, *i.e.* a CT or MRI scan, confirmed such damage.

To the contrary, Dr. Collings testified in his deposition that there are essentially three ways to determine whether a person has sustained physical brain damage: (1) CT or MRI scanning; (2) cognitive behavioral level of functioning; and (3) neuropsychological testing. Dr. Collings opined that the first two methods were inconclusive in this case. In addition, Dr. Collings concluded that there can be physical damage to the brain that does not appear on normal scans, and Dr. Moss was in a better position to assess Petitioner's brain damage based on the neuropsychological examination rather than his own in-office examination. In so concluding, Dr. Collings testified that neuropsychological testing was "the

---

10. Petitioner does not directly raise this question in his brief. However, Respondents argues vehemently that Petitioner has not proved his injuries "were so severe that he will require specialized healthcare over the remainder of his life expectancy."

best information that would support that there's ... significant change between this pre- and post-condition." Dr. Collings further testified that the neuropsychological report was an in-depth test that neurologists use to diagnose injuries to the brain, and neurologists "sort of view it just like we do the MRI scan." In light of this testimony, we are reluctant to require use of a specific diagnostic tool in proving these medically-technical brain injury cases.

 Importantly, it is always incumbent on the employee-claimant to prove that he or she has sustained an injury by accident, and demonstrate that he or she is entitled to benefits. *See Clade v. Champion Labs.*, 330 S.C. at 11, 496 S.E.2d at 857 (citation omitted). The fact that the injury alleged is physical brain damage under section 42–9–10(C) does not change the employee-claimant's ultimate burden of proving his or her injuries.[11]

## Conclusion

Based on the foregoing, we reverse the court of appeals and remand this case to the Commission for a determination of MMI, permanency, and whether Petitioner's injury constitutes "physical brain damage" as contemplated by section 42–9–10(C) of the South Carolina Code, which would entitle him to workers' compensation benefits for life.

BEATTY, KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., concurring in result in a separate opinion.

Justice PLEICONES.

I concur in result. I agree with the majority that this case must be remanded to the Commission to clarify its holding regarding whether Petitioner's brain injury qualifies for lifetime benefits under S.C.Code Ann. § 42–9–10(C) (Supp.2011). However, I write separately because I would not reach the question what constitutes severe brain damage for purposes of

---

11. We need not address the remaining issues on appeal, as our holding is dispositive. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding appellate courts need not address remaining issues when determination of prior issue is dispositive).

§ 42–9–10. Rather, I would wait until a case is before us for review of a Commission decision addressing it. I would then defer to the agency interpretation of the statute, if reasonable. *See CFRE, LLC v. Greenville County Assessor,* 395 S.C. 67, 77, 716 S.E.2d 877, 882 (2011) ("The construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons.").

I also note that the language of other states' statutes cannot guide our interpretation of different language adopted by the General Assembly. Even to the extent we give great weight to North Carolina courts' interpretation of its workers' compensation act, this is true only when the courts deal with identical statutory language. *See Flemon v. Dickert–Keowee, Inc.,* 259 S.C. 99, 102, 190 S.E.2d 751, 752 (1972) ("At [the] time [the cited North Carolina case was decided] the pertinent provisions of the North Carolina Act were identical with the Code sections hereinabove quoted from our Act.").

Thus, I concur in result.