755 S.E.2d 462

**Hector G. FRAGOSA, Employee/Claimant, Appellant,**

v.

**KADE CONSTRUCTION, LLC, Employer, and Key Risk Management Services, Inc., Carrier, Respondents.**

Appellate Case No. 2012–212279.

No. 5185.

Court of Appeals of South Carolina.

Heard Oct. 10, 2013.
Decided Nov. 27, 2013.
Rehearing Denied March 31, 2014.

Stephen Benjamin Samuels, of Samuels Law Firm, LLC, of Columbia, and Jeffrey Christopher Chandler, of Chandler Law Firm, of Myrtle Beach, for Appellant.

Michael W. Burkett and John Gabriel Coggiola, both of Willson Jones Carter & Baxley, P.A., of Columbia, for Respondents.

LOCKEMY, J.

Hector Fragosa appeals the South Carolina Workers' Compensation Commission Appellate Panel's (Appellate Panel) order, arguing the Appellate Panel erred in (1) finding he did not suffer physical brain damage, and was thus not entitled to lifetime benefits; and (2) relying on the opinion of Dr. Mark Wagner. We affirm in part and remand.

## FACTS/PROCEDURAL BACKGROUND

On November 1, 2007, Fragosa, a construction worker employed by Kade Construction, LLC (Kade), sustained injuries during the course and scope of his employment when he was hit in the head with part of a construction crane and knocked off of the roof of a parking garage. Fragosa was transported by helicopter to MUSC in Charleston and remained in a coma for two weeks following the accident.

Pursuant to his MUSC discharge summary, Fragosa's diagnoses included: subdural and epidural hematomas, bilateral frontal contusions, respiratory failure, hypotension, scalp lac-

eration, C7 and T1 spinous process fractures, right rib fractures, bilateral transverse fractures, right big toe fracture, right fifth toe fracture, skull fracture, tracheostomy, placement of endoscopic gastrostomy, and amputation of the second through fifth toes of the right foot.

Kade accepted Fragosa's claim and began providing benefits. In October 2008, Fragosa was evaluated by Dr. Mark Wagner, a clinical neuropsychologist. Dr. Wagner noted Fragosa sustained a skull fracture with acute underlying minor structural change to the brain, but his functional studies (i.e., EEGs, CTs, and MRIs) were read as "unremarkable" and demonstrated "structural resolution of the work-related injury." Dr. Wagner found Fragosa had "symptoms of mild post-concussive syndrome" and his cognitive deficits were "relatively mild." According to Dr. Wagner, Fragosa was most likely at maximum medical improvement in terms of his neurological status, and the severity of his cognitive deficits was not a major barrier to his return to work.

From October 2008 to August 2009, Fragosa was treated by neurologist Dr. George Sandoz for headaches and dizziness. Dr. Sandoz determined Fragosa had a right temporal lobe injury, but found there was "no evidence of any seizure ... nor any evidence of any damage of the brain." Dr. Sandoz testified Fragosa had damage to his right inner ear which caused some loss of hearing and mastoiditis. Dr. Sandoz opined Fragosa suffered a traumatic brain injury and was totally and permanently disabled. According to Dr. Sandoz, Fragosa had a 46% impairment rating to the whole body. Dr. Sandoz opined Fragosa would be unable to return to gainful employment "not only because of the traumatic injury" but also because his inner ear injury would make him unsteady on his feet. Dr. Sandoz testified that while Fragosa suffered some damage and injury to the *function* of the brain, "there's no evidence of any damage on the brain that we can go and see." In a March 2011 questionnaire from Fragosa's attorney, Dr. Sandoz checked "Yes" in response to the question of whether Fragosa suffered physical brain damage rendering him totally and permanently disabled.

In October 2010, Fragosa was evaluated by psychologist and brain injury specialist Dr. Robert Brabham. Dr. Brabham

noted Fragosa continued to experience symptoms typically associated with brain injuries including headaches, dizziness, anxiety, depression, and memory loss. Dr. Brabham concluded Fragosa's "behavioral and cognitive changes have persisted ... sufficient to conclude that the brain injuries he sustained, described as post-concussion injuries in multiple records, has resulted in continuing and severe symptoms clearly associated with a physical traumatic brain injury, the result of his on-the-job injuries." Dr. Brabham further opined "to a high degree of medical certainty ... [Fragosa] has experienced a (Physical) Traumatic Brain Injury and must be expected to permanently remain, unable to engage in full-time gainful, competitive employment."

On March 21, 2011, Kade and its insurance carrier, Key Risk Management Services, Inc., (collectively, Respondents) filed a Form 21 seeking to terminate temporary compensation. On April 8, 2011, Fragosa filed a Form 50 alleging he was totally and permanently disabled as a result of injuries to his "brain, headaches, vision, spine, both upper extremities, left shoulder, hips, both lower extremities, right foot and psychological overlay." Fragosa also alleged he sustained physical brain damage as a result of the accident. Respondents filed a Form 51 admitting Fragosa sustained a work injury, but denying the extent of the injuries as alleged by Fragosa.

A hearing was held before the Single Commissioner on June 28, 2011. At the hearing, Fragosa alleged he was entitled to additional medical treatment as result of his accident and a finding that he was totally and permanently disabled based on the totality of his injuries. Additionally, Fragosa claimed he suffered physical brain damage pursuant to section 42-9-10(C) of the South Carolina Code (Supp.2012) and thus, he was entitled to lifetime medical benefits. Respondents argued Fragosa was not totally and permanently disabled and they were entitled to stop payment of Fragosa's temporary benefits because he had reached MMI. Respondents also argued Fragosa did not suffer physical brain damage, and any permanent disability compensation for an alleged injury to Fragosa's brain fell under Regulation 67–1101 of the South Carolina Code of Regulations (2012) which sets forth the range of 25–250 weeks for either partial or total loss of use of the brain as a result of a work accident.

In a November 21, 2011 order, the Single Commissioner held Fragosa's multiple impairment ratings to his right leg, left arm, head and inner ear rendered him totally and permanently disabled. Additionally, the Single Commissioner found Fragosa did not suffer a physical brain injury or physical brain damage, and was not entitled to lifetime medical benefits. Fragosa appealed the Single Commissioner's findings to the Appellate Panel. Following a hearing, the Appellate Panel affirmed the Single Commissioner's order in May 2012. Fragosa appealed.

## STANDARD OF REVIEW

■ The Administrative Procedures Act establishes the standard of review for decisions by the Appellate Panel. *Lark v. Bi–Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981). The Appellate Panel is the ultimate fact finder in workers' compensation cases and is not bound by the single commissioner's findings of fact. *Etheredge v. Monsanto Co.*, 349 S.C. 451, 454, 562 S.E.2d 679, 681 (Ct.App.2002). The findings of the Appellate Panel are presumed correct and will be set aside only if unsupported by substantial evidence. *Lark*, 276 S.C. at 135, 276 S.E.2d at 306. "Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence that, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action." *Taylor v. S.C. Dep't of Motor Vehicles*, 368 S.C. 33, 36, 627 S.E.2d 751, 752 (Ct.App.2006) (quoting *S.C. Dep't of Motor Vehicles v. Nelson*, 364 S.C. 514, 519, 613 S.E.2d 544, 547 (2005)). "The mere possibility of drawing two inconsistent conclusions from the evidence does not prevent a finding from being supported by substantial evidence." *Olson v. S.C. Dep't of Health & Envtl. Control*, 379 S.C. 57, 63, 663 S.E.2d 497, 501 (Ct.App.2008).

## LAW/ANALYSIS

### I. Physical Brain Damage

■ Fragosa argues the Appellate Panel erred in finding he did not suffer physical brain damage and was not entitled to lifetime medical benefits. We remand.

The nexus of this case is the distinction between a physical brain *injury*, which is compensated pursuant to Regulation 67–1101,[1] and physical brain *damage*, which is compensated pursuant to section 42–9–10(C). Fragosa argues on appeal that the Appellate Panel erred in failing to find he suffered physical brain *damage* and was entitled to lifetime medical benefits. However, throughout his brief Fragosa cites examples to support his position that he suffered a brain *injury*. Respondents do not deny that Fragosa suffered a physical brain *injury*. Instead, they maintain Fragosa failed to show he suffered physical brain *damage*.

In general, a person injured within the Workers' Compensation Act (the Act) may not receive compensation for a period exceeding five hundred weeks. *See* S.C.Code Ann. § 42–9–10(A) (Supp.2012); S.C.Code Ann. Regs. 67–1101 (2012). However,

> [n]otwithstanding the five-hundred-week limitation prescribed in this section or elsewhere in this title, any person determined to be totally and permanently disabled who as a result of a compensable injury is a paraplegic, a quadriplegic, *or who has suffered physical brain damage* is not subject to the five-hundred-week limitation and shall receive the benefits for life.

S.C.Code Ann. § 42–9–10(C) (Supp.2012) (emphasis added). "Physical brain damage" is not statutorily defined. However, our supreme court recently clarified what is meant by "physical brain damage" under section 42–9–10(C) in *Crisp v. South-*

---

1. Section 42–9–30 of the South Carolina Code (Supp.2012) provides specific recoveries for total or partial physical losses and impairments suffered by an employee to certain scheduled members including: thumbs, fingers, toes, hands, arms, feet, legs, eyes, and ears. This section further provides:

   For the total or partial loss of, or loss of use of, a member, organ, or part of the body *not covered in this section* ... [t]he Commission, by regulation, shall prescribe the ratio which the partial loss or loss or partial loss of use of a particular member, organ, or body part bears to the whole man, basing these ratios on accepted medical standards and these ratios determine the benefits payable under this subsection.

   S.C.Code Ann. § 42–9–30(22) (Supp.2012) (emphasis added). Regulation 67–1101 provides additional examples of compensable scheduled members, including the brain. It sets forth the range of 25–250 weeks of compensation for either partial loss or loss of use of the brain. S.C.Code Ann. Regs. 67–1101 (2012).

*Co., Inc.,* 401 S.C. 627, 738 S.E.2d 835 (2013) *(Crisp II).* In *Crisp II,* the court found Crisp's argument that the mere presence of any physical brain injury or damage, regardless of degree, triggered the operation of section 42–9–10(C) was not persuasive. 401 S.C. at 641, 738 S.E.2d at 842. The court viewed

> the inclusion of 'physical brain damage,' along with quadriplegia and paraplegia, in section 42–9–10(C) as indicative of the General Assembly's intent to compensate an employee-claimant for life only in the most serious cases of injury to the brain, separate and apart from other scheduled injuries, resulting in permanent physical brain damage.

*Crisp,* 401 S.C. at 641–42, 738 S.E.2d at 842. The *Crisp II* court found "the severity of the injury is the lynchpin of the analysis" and interpreted "the inclusion of 'physical brain damage' among the most serious injuries within the statutory exception to the 500 week cap on benefits as an indication that the legislature was contemplating a brain injury so severe that the person could not subsequently return to suitable gainful employment." *Id.* at 643, 738 S.E.2d at 843. The court stated its interpretation of the legislature's intent was "in harmony with the entire purpose of our workers' compensation regime and recognizes the other avenues of compensation available under the scheme for brain injuries that do not render the worker unemployable." *Id.* at 644, 738 S.E.2d at 843. Further, the court noted the question of whether an employee has sustained either a physical brain injury or physical brain damage "gives rise to the coextensive question of what proof is required in these cases." Id. at 644, 738 S.E.2d at 844. In light of the testimony, the Crisp II court found it was "reluctant to require use of a specific diagnostic tool in proving these medically-technical brain injury cases." Id.

Additionally, in *Sparks v. Palmetto Hardwood, Inc.,* 406 S.C. 124, 130, 750 S.E.2d 61, 64 (2013), our supreme court declined to impose a requirement that physical brain damage be proven through an "objective diagnostic medium," and concluded that physical brain damage, as described in section 42–9–10(C), is damage that is permanent and severe.

Here, the Appellate Panel made inconsistent findings with regard to the existence of a physical brain injury. In finding

of fact # 8, the Appellate Panel found Fragosa sustained a forty-six percent impairment to the whole person for a traumatic brain injury. However, in finding of fact # 18, the Appellate Panel found Fragosa did not suffer a brain injury. Based on this inconsistency, we remand to the Appellate Panel for clarification. It is undisputed that Fragosa suffered severe injuries as a result of a work related accident. However, it is unclear whether the Appellate Panel found these injuries included an injury to the brain. If the Appellate Panel finds Fragosa did sustain a physical brain injury, it should, in light of *Crisp II* and *Sparks*, cite specific evidence to support its determination as to whether such injury was of sufficient severity to reach the level of physical brain damage as contemplated in section 42–9–10(C).

## II. Dr. Wagner

■ Fragosa argues the Appellate Panel erred in relying on Dr. Wagner's report in finding Fragosa did not suffer physical brain damage. We disagree.

The Appellate Panel found:

Dr. Mark Wagner noted that [Fragosa] sustained a skull fracture with acute underlying minor structural change to the brain, but Dr. Wagner concluded that functional studies, such as EEGs, CTs, and MRIs, were read as unremarkable 'demonstrating structural resolution of the work-related injury.' ( [Fragosa]'s APA # 4, pg. 655).

Fragosa contends the Appellate Panel's reliance on Dr. Wagner's statement regarding imaging studies having been read as unremarkable is legal error. He maintains Dr. Wagner never rendered an opinion, or "concluded" as the order states, that Fragosa did not suffer physical brain damage. Instead, Fragosa argues Dr. Wagner merely commented that the later imaging studies were read as unremarkable. Fragosa asserts that as a neuropsychologist, Dr. Wagner cannot interpret imaging studies.

In reply, Respondents argue Dr. Wagner simply restated the findings made by other doctors who interpreted the studies. Respondents assert Dr. Wagner's reliance on the interpretations of other doctors was proper since all of the doctors who treated Fragosa relied on the diagnostic testing to deter-

mine the proper course of treatment despite the fact that they were not radiologists specifically trained to interpret the films themselves.

We disagree with Fragosa's assertion that the Appellate Panel found Dr. Wagner had "concluded" that Fragosa's diagnostic studies were unremarkable. Dr. Wagner did not find the studies unremarkable; he simply restated the findings made by the doctors who did interpret the studies. The radiologist who performed Fragosa's January 2008 CT found (1) no evidence of acute intracranial process and (2) healing skull fractures. The radiologist who conducted Fragosa's September 2008 MRI found (1) right mastoiditis and an (2) otherwise unremarkable MRI of the brain. Finally, Dr. Sandoz determined Fragosa's October 2008 EEG was within a wide range of normal limits with "no focal abnormality or seizure discharges" noted. As a neuropsychologist, Dr. Wagner is able to consider the diagnostic studies and findings of other doctors in the formation of his opinion. Thus, the Appellate Panel did not err in relying on the opinion of Dr. Wagner.

## CONCLUSION

We affirm the Appellate Panel's reliance on the opinion of Dr. Wagner and remand for clarification regarding the existence of a physical brain injury.

**AFFIRMED IN PART AND REMANDED.**

HUFF and GEATHERS, JJ., concur.