**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Victor G. Benjamin, Employee, Appellant,

v.

Rexam Beverage Can Company d/b/a Rexam Beverages, Employer, and Hartford Insurance Company of the Midwest c/o Sedgwick CMS, Carrier, Respondents.

Appellate Case No. 2018-000965

———————

Appeal From The Workers' Compensation Commission

———————

Unpublished Opinion No. 2021-UP-314
Heard March 1, 2021 – Filed September 1, 2021

———————

**REVERSED**

———————

Jeffrey Christopher Chandler, of Chandler Law Firm, of Myrtle Beach, and Stephen Benjamin Samuels, of Samuels Reynolds Law Firm, LLC, of Columbia, for Appellant.

Jason Wendell Lockhart, of Columbia, and Helen F. Hiser, of Mount Pleasant, both of McAngus Goudelock & Courie, LLC, for Respondents.

———————

**PER CURIAM:** In this workers' compensation appeal, Appellant Victor Benjamin was hurt while operating within the scope of his employment with Respondent Rexam Beverages. Appellant argues the Appellate Panel of the South Carolina Workers' Compensation Commission (the Commission) erred by (1) denying him lifetime benefits for his physical brain damage; (2) finding he failed to prove that he is an incomplete quadriplegic; and (3) denying his request for a mobility scooter. We reverse.

## FACTS

Appellant worked for Rexam Beverages[1] for over thirty years. At the time of his workplace accident, he was a cupper operator. On June 5, 2011, while Appellant was operating within the scope of his employment as a cupper operator, a thirty-pound metal object dislodged from the cupper and fell on his head and shoulder. The metal object fell approximately twenty to thirty feet and knocked Appellant unconscious for approximately eight to ten minutes. He was forty-nine years old at the time of the accident.

Appellant was taken to the hospital and admitted into the intensive care unit. He was diagnosed with a left parietal skull fracture, closed head injury with concussion, and a right forearm injury (possible tendon and nerve injury). The attending physician noted that Appellant had a headache and complained of dizziness and both his upper and lower extremities had normal bulk and tone, "with a 5/5 strength in the left grip, both biceps, triceps, deltoids, iliopsoas, quadriceps, hamstrings, gasiroc, and anterior timbales motor groups." Further, Appellant was unable to straighten his fingers. After undergoing surgery for the arm injury, he was released from the hospital on June 17, 2011. He returned to the hospital on June 24, 2011, citing significant headaches, lightheadedness, and dizziness.

On September 16, 2011, Appellant began treatment for his brain and spinal cord injuries with neurologist Dr. George Sandoz. Dr. Sandoz's initial report indicated that Appellant had moderate symptoms related to his head injury, neck pain, and dizziness. The results of Appellant's physical examination were as follows: moderate distress, well-nourished, well-developed; muscle spasms in cervical and lumbar spines; alert and oriented with grossly normal intellect; memory intact; cranial nerves intact; normal motor reflexes; normal spinal accessory; no sensory loss; no motor weakness; balance and gait intact; coordination intact; and normal

---

[1] The company manufactures beverage cans.

fine motor skills. Dr. Sandoz noted that Appellant had difficulty with ambulation and needed assistance with "activities of daily living."

At some point during the course of Dr. Sandoz's early treatment of Appellant, Appellant began having seizures, with the last one occurring in February 2012. Dr. Sandoz prescribed Appellant medication that stopped the seizures with no apparent side effects. By September 2012, Dr. Sandoz listed Appellant's dizziness as severe and his loss of consciousness as moderate.

On June 19, 2015, Dr. Sandoz provided Appellant's requisite impairment ratings based on the "AMA Guidelines Sixth Edition," writing:

> As a result of this injury, the patient has suffered cervical disc injury that has left him with myelomalacia and he has been undergoing care by Dr. Poletti. I agree with the impairment rating given from the spinal cord injury and from the spinal cord lesion that he has. From the neurological standpoint, the patient has also been complaining of [] headache[s]. [Because of these] headache[s] . . . the patient has 4% impairment of the whole body. The patient has also [] suffered a traumatic brain injury with late effect of this injury associated with the headaches, seizure, posttraumatic stress disorder, and lumbar pain. From the injury that the patient has suffered a traumatic brain injury, the patient suffers a 29% impairment of the whole body . . . . From the seizure standpoint, the patient had like 34% impairment of the whole body. Utilizing a combined value chart, this translates to 54% impairment of the whole body.

Dr. Sandoz later noted that Appellant had "suffered physical brain damage the severity of which renders him incapable of returning to any form of gainful employment." Further, he was of the opinion that Appellant's spinal cord injury qualified as "incomplete quadriparesis or a form of incomplete quadriplegia."

In January 2013, Appellant began treatment for his spinal cord injury with neurosurgeon Dr. Karl A. Lozanne. At his initial visit, Dr. Lozanne noted Appellant:

> [C]ontinued to struggle with headaches, neck pain, right-sided Interscapular and shoulder pain that radiates down

into his right arm. He has developed difficulties with his balance and has had numbness and tingling worse on the right than the left. He has developed weakness in the right upper extremity. He denies any urinary or bowel symptoms. He has been managed with oral analgesics, physical therapy and more recently epidural steroid injection. The epidural steroid injections initially were effective at relieving his right-sided arm discomfort but the pain has returned. He underwent an MRI of the cervical spine which revealed significant cervical stenosis with disc/osteophyte complexes as well as what appeared to be spinal cord signal change.

Dr. Lozanne then noted that Appellant was awake, alert, and oriented with normal and appropriate speech, while his motor functions were "4+/5 in the right deltoid, bicep, tricep, hand intrinsics[,]" and 5/5 in all other muscle groups. Dr. Lozanne "recommended surgical intervention in the form of an anterior cervical discectomy and plated fusion at C4-5, C5-6 and C6-7." It was his opinion that the C3-4 level did not require any surgical intervention at that time.

Dr. Lozanne performed the recommended surgery on February 18, 2013. In August 2013, Dr. Lozanne noted that the "initial improvement that was made after surgery [was] no longer present." He noted that Appellant felt his imbalance persisted and that Appellant ambulated with the aid of a cane. Further, an MRI of his right shoulder revealed shoulder pathology. Dr. Lozanne sent Appellant to a shoulder specialist and stated that he did not feel Appellant needed new imaging studies of his cervical spine at that time. He recommended Appellant remain out of work. Then on November 11, 2013, Dr. Lozanne examined Appellant and noted that he continued to struggle with difficulties from his spinal cord injury but was better than his preoperative condition. Dr. Lozanne advised that he did not feel Appellant was at maximum medical improvement (MMI) in regards to his cervical spine and spinal cord injury and requested to examine Appellant again in February 2014, which was one year after his February 2013 surgical procedure.

On January 21, 2014, Appellant received unauthorized treatment from spinal surgeon Dr. Steven C. Poletti. Dr. Poletti noted that Appellant had "gotten worsening stenosis or progressing cervical stenosis at the C3-4 level where there [was] noted to be edema changes in the cord, some measure of settling and posterior disc bulging at the C3-4 level with spinal cord compression with high signal in the cord at the C3-4 level." Dr. Poletti recommended surgery, stating he believed

surgery was not likely to improve Appellant's condition but may stop it from worsening.  Dr. Poletti performed the C3-4 level surgery on February 13, 2014.  Following the surgery, Dr. Lozanne released Appellant from his care.

Appellant continued his treatment for his spinal cord injury with Dr. Poletti.  On May 27, 2015, Dr. Poletti wrote that Appellant had impairment "in addition from the spinal cord injury . . . not only from the fusion but from the myelomalacia or spinal cord compression."  He noted Appellant was "limited to level surfaces of walking and has criteria for impairment due to station and gait disorder, and he does not have digital dexterity in his hands as a consequence of the injury."  Dr. Poletti assigned Appellant a 67% whole person impairment rating.[2]  Dr. Poletti noted that Appellant had a "form of spinal cord injury or incomplete quadriplegia, and this is the rationale behind him having this level of disabling impairment and injury."

On July 22, 2016, Dr. Lozanne performed a final evaluation of Appellant.  He noted Appellant had "no incontinence, no difficulty urinating, no hematuria, and no increased frequency."  Additionally, he wrote that Appellant was awake, alert, answering questions, and had the same positive motor strength as previously documented.  Dr. Lozanne assigned a whole person impairment rating for the cervical fusion of 28% under DRE Category IV.  For the spinal cord injury, he assigned 19% for the cortical spinal tract impairment and 19% for the "bilateral upper extremity involvement & station and gait."  The combined whole person impairment rating equaled 53%.  Dr. Lozanne opined that Appellant suffered from an incomplete spinal cord injury, but disagreed with Dr. Poletti that Appellant suffered from incomplete quadriplegia.

On May 3, 2016, Appellant filed a Form 50 seeking lifetime compensation and treatment for physical brain damage and incomplete quadriplegia.  Additionally, Appellant requested "authorization of [a] motorized scooter, cervical collar[,] and epidural lumbar steroid injection ordered by Dr.[] Sandoz."  A hearing on the matter was held on August 18, 2016, before a single commissioner.

In a July 21, 2017 order, the single commissioner found that based on all the testimony presented, Appellant was permanently and totally disabled and was entitled to lifetime causally-related medical treatment for his neck, right arm, brain (headaches & seizures), and depression.  Further, the single commissioner found that Appellant failed to prove that he suffered from incomplete quadriplegia or sustained

_____

[2] This included a 28% medical impairment to the cervical spine, 39% for the spinal cord injury, and 28% for the cervical fusions.

permanent and severe physical brain damage, and thus, failed to prove that he was entitled to lifetime benefits. Additionally, the single commissioner found that the record contained insufficient evidence the need for a mobility scooter was related to Appellant's compensable injuries. Appellant appealed the matter to the Commission, which affirmed the single commissioner's findings by an order issued on April 24, 2018. This appeal followed.

## ISSUES ON APPEAL

1. Did the Commission err in denying Appellant's claim for lifetime benefits by finding Appellant did not prove he sustained permanent and severe physical brain damage?

2. Did the Commission err in denying Appellant's claim for lifetime benefits by finding Appellant failed to prove he is an incomplete quadriplegic under the law?

3. Did the Commission err by denying Appellant a motorized scooter when the scooter was authorized by Appellant's attending physician?

## STANDARD OF REVIEW

"The Administrative Procedures Act (APA) provides the standard for judicial review of decisions by the Commission." *Pierre v. Seaside Farms, Inc.*, 386 S.C. 534, 540, 689 S.E.2d 615, 618 (2010). "In workers' compensation cases, the Commission is the ultimate fact finder." *Holmes v. Nat'l Serv. Indus., Inc.*, 395 S.C. 305, 308, 717 S.E.2d 751, 752 (2011). "An appellate court must affirm the findings made by the Commission if they are supported by substantial evidence." *Id.* However, "[a]n appellate court can reverse or modify the Commission's decision if it is affected by an error of law or is clearly erroneous in view of the reliable, probative, and substantial evidence in the whole record." *Pierre*, 386 S.C. at 540, 689 S.E.2d at 618. "Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence [that], considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action." *Taylor v. S.C. Dep't of Motor Vehicles*, 368 S.C. 33, 36, 627 S.E.2d 751, 752 (Ct. App. 2006) (quoting *S.C. Dep't of Motor Vehicles v. Nelson*, 364 S.C. 514, 519, 613 S.E.2d 544, 547 (Ct. App. 2005)).

## LAW/ANALYSIS

## I. Lifetime Benefits

Appellant argues the Commission erred by finding he did not prove that he suffers from physical brain damage pursuant to section 42-9-10(C) of the South Carolina Code (2015). We agree.

Section 42-9-10 of the South Carolina Code (2015) provides a limit on the amount of compensation an injured worker may receive from his employer. "In no case may the period covered by the compensation exceed five hundred weeks except as provided in subsection (C)." § 42-9-10(A). Subsection (C) provides,

> Notwithstanding the five-hundred-week limitation prescribed in this section or elsewhere in this title, any person determined to be totally and permanently disabled who as a result of a compensable injury is a *paraplegic*, a *quadriplegic*, or who has suffered *physical brain damage* is not subject to the five-hundred-week limitation and shall receive the benefits for life.

(Emphases added). As an exception to the general rule, the General Assembly created subsection (C) for claimants whose compensable injury has rendered them "totally and permanently disabled" and who suffer from the severe and permanent physical impairment of either paraplegia, quadriplegia, or physical brain damage. *See id.*; *Sparks v. Palmetto Hardwood, Inc.*, 406 S.C. 124, 129, 750 S.E.2d 61, 63 (2013) (labeling both paraplegia and quadriplegia as severe and permanent physical impairments and stating that the General Assembly meant to require the same restrictive meaning to the term "physical brain damage").

Our supreme court has held that "'physical brain damage[,]' as used in section 42-9-10(C)[,] is physical brain damage that is both permanent and severe." *See Sparks*, 406 S.C. at 131, 750 S.E.2d at 64. While "permanency and physicality are requirements" to qualify as physical brain damage under the statute, "the severity of the injury is the lynchpin of the analysis." *Crisp v. SouthCo.*, 401 S.C. 627, 642, 738 S.E.2d 835, 842 (2013). "Inherent in the requirement that the injury to the brain be severe is the requirement that the worker is unable to return to suitable gainful employment." *Id.*

In the current matter, in finding that Appellant did not prove he suffered physical brain damage pursuant to section 42-9-10(C), the Commission cited as

evidence the following: (1) three brain scans performed by three different physicians; (2) Appellant's appearance at and participation in two depositions; (3) Appellant's "attendance at most of his medical appointments on his own to which he also drove himself on his own"; (4) Appellant's service as treasurer of his union hall throughout 2012; and (5) the "lack of any medical evidence stated to a reasonable degree of medical certainty that [Appellant] sustained brain damage that was permanent and severe." In light of the uncontroverted medical evidence from Dr. Sandoz's diagnoses, we can discern no reasonable basis for this finding. *See Crane v. Raber's Disc. Tire Rack*, 429 S.C. 636, 648, 842 S.E.2d 349, 355 (2020) ("[T]he commission's factual determinations 'must be founded on evidence of sufficient substance to afford a reasonable basis for it." (quoting *Hutson v. S.C. State Ports Auth.*, 399 S.C. 381, 387, 732 S.E.2d 500, 503 (2012))).

Dr. Sandoz could not have been more certain when he stated definitively that in his "opinion [Appellant] suffered physical brain damage the severity of which renders him incapable of returning to any form of gainful employment." Because there was no competent contrary evidence or opinion presented, the Commission was not entitled to disregard Dr. Sandoz's medical opinion. *See Potter v. Spartanburg Sch. Dist. 7*, 395 S.C. 17, 23, 716 S.E.2d 123, 126 (Ct. App. 2011) ("[W]hile medical testimony is entitled to great respect, the fact finder may disregard it if other competent evidence is presented."); *see also Sparks*, 406 S.C. at 127, 131, 750 S.E.2d at 62, 64–65 (concluding the Commission did not err by finding the appellant did not suffer from physical brain damage where a total of six doctors gave varying opinions about the severity of the appellant's physical brain injury). Dr. Sandoz assigned Appellant a 54% whole body impairment rating for injuries related to his brain. This neurological impairment rating was not contested by Respondents or the Commission. In fact, the Commission acknowledged that Appellant "sustained compensable injuries to his . . . brain . . . for *initial closed head injury* and resulting *headaches* and *seizures* . . . ." (Emphasis added). This was in line with Dr. Sandoz's neurological impairment rating, including: 29% for the *traumatic brain injury*, 4% for *headaches*, and 34% for *seizures*.

The closest semblance to contrary medical evidence relied on by the Commission are the results of the three brain scans. The three brain scans, conducted in 2011 before Appellant's condition worsened and he was diagnosed as having seizures, all yielded similar results of mild left frontal parietal fracture, with no intracranial hemorrhage. However, the brain scans, one of which was conducted by Dr. Sandoz, did not counter Dr. Sandoz's later findings of severe physical brain damage; the other two physicians that conducted a scan did not opine as to whether Appellant suffered physical brain damage. The brain scans alone are not diagnoses

and are not the only diagnostic tool used by doctors in conducting their overall evaluation. *See Crisp*, 401 S.C. at 644, 738 S.E.2d at 844 ("Dr. Collings concluded that there can be physical damage to the brain that does not appear on normal scans . . . ."); *id.* at 645, 738 S.E.2d at 844 ("In light of this testimony, we are reluctant to require use of a specific diagnostic tool in proving these medically-technical brain injury cases."); *see also Fragosa v. Kade Const., LLC*, 407 S.C. 424, 426, 755 S.E.2d 462, 464 (Ct. App. 2013) ("Dr. Sandoz testified that while [the appellant] suffered some damage and injury to the *function* of the brain, 'there's no evidence of any damage on the brain that we can go and see.'"). Additionally, even though he conducted one of the brain scans, Dr. Sandoz was still of the opinion that Appellant suffered physical brain damage. Moreover, the brain injury caused Appellant to suffer from seizures that now require medication to control.[3] He has been diagnosed with dementia and continues to suffer from headaches, migraines, irritability, anger and dizziness.

Based on the foregoing, and in view of the substantial evidence in the record, we conclude that the Commission erred by finding Appellant did not prove he suffered physical brain damage. *See Pierre*, 386 S.C. at 540, 689 S.E.2d at 618 ("Substantial evidence is not a mere scintilla of evidence, but evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the agency reached." (quoting *Tennant v. Beaufort County Sch. Dist.*, 381 S.C. 617, 620, 674 S.E.2d 488, 490 (2009)). As Appellant's attending physician, Dr. Sandoz viewed all of the diagnostic evidence and deduced that Appellant sustained a 54% whole body impairment due to his brain injury, leading him to conclude that Appellant sustained severe physical brain damage that left him incapable of returning to work. Based on this uncontroverted evidence, we find reasonable minds could not reach the conclusion that the Commission "reached or must have reached" that Appellant did not suffer physical brain damage pursuant to section 42-9-10(C). *See Lewis v. L.B. Dynasty, Inc.*, 419 S.C. 515, 518, 799 S.E.2d 304, 305 (2017) ("Substantial evidence is . . . 'evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that [the commission] reached or must have reached' to support its orders." (quoting *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981))). Accordingly, we reverse the Commission's denial of lifetime benefits. *Pierre*, 386 S.C. at 540, 689 S.E.2d at 618 ("An appellate court can reverse or modify the Commission's decision if it is affected by an error of

---

[3] At some point, Dr. Sandoz gave Appellant instructions not to drive because of his seizures. His driving privileges were restored in June 2012.

law or is clearly erroneous in view of the reliable, probative, and substantial evidence in the whole record.").[4]

## II.     Mobility Scooter

Appellant contends the Commission erred by finding he failed to prove the need for a mobility scooter was related to his compensable injuries and ultimately denying his request for a scooter. We agree.

In response to a questionnaire sent to him by Appellant's counsel, Dr. Sandoz answered affirmatively that Appellant required the use of a motorized scooter to aid him with ambulation as a result of the workplace accident. At the hearing, Appellant advised that Dr. Sandoz indicated the need for a mobility scooter was because of the cervical cord injury.

In its order, the Commission first concluded that the medical record contained insufficient evidence to support a finding that Appellant sustained an injury to his lower back (and any resulting radiculopathy to the legs) as a result of his work injury. The Commission then wrote the following:

> Pursuant to [s]ection 42-15-60 and based on the preponderance of the evidence as a whole we find [Appellant] is not entitled to a mobility scooter as there is insufficient evidence in the record causally[]relating the need for the scooter to compensable injuries as outlined above. Specifically, Dr. Sandoz did not prescribe the mobility scooter until October 1, 2015[,] after [Appellant] alleged lower back and bilateral lower extremity symptoms associated with his 2011 work injury—claims which have been denied as noted above.

The implication is that Dr. Sandoz prescribed the scooter for unrelated lower back and bilateral lower extremities symptoms resulting from a lower back injury that was not caused by the workplace accident. The Commission's finding is not

---

[4] Because we find Appellant is entitled to lifetime benefits due to his physical brain damage, we need not address the incomplete quadriplegia issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

supported by substantial evidence. The fact that Dr. Sandoz prescribed the scooter four years into Appellant's treatment does not mean Dr. Sandoz prescribed the scooter for injuries unrelated to Appellant's workplace accident or that the scooter is not medically necessary. The only medical opinion available regarding the mobility scooter was that Appellant needed the scooter because of injuries sustained as a result of his cervical cord injury caused by his workplace accident. Accordingly, we find the Commission erred by denying Appellant the scooter prescribed by his authorized physician. *See Pierre*, 386 S.C. at 540, 689 S.E.2d at 618 ("An appellate court can reverse or modify the Commission's decision if it is affected by an error of law or is clearly erroneous in view of the reliable, probative, and substantial evidence in the whole record.").

## CONCLUSION

Based on the foregoing, we reverse the Commission on the issue of physical brain damage and find that Appellant is entitled to lifetime benefits. Additionally, we reverse the Commission on the mobility scooter issue. We do not reach the issue of whether the Commission erred by finding Appellant did not suffer from "incomplete quadriplegia." Accordingly, the Commission's order is

**REVERSED.**

**KONDUROS, GEATHERS, and MCDONALD, JJ., concur.**